When it was judicially ascertained that the associations formed, pursuant to the act of the 18th April, 1838, to authorize the business of banking, were bodies corporate, it followed, as a consequence, that they were also subject to the provisions of the statute concerning moneyed corporations. (1 R.S., 601.) Such is the judgment of this court in Talmage v. Pell (3 Seld.,
328), as expressed in the first resolution. The learned judge who delivered the opinion declined to consider whether the certificates of deposit were promissory notes payable on time and void under the first and thirty-fifth sections of the safety fund act, or whether the assignment in question in that action was made when the corporation was insolvent or in contemplation of insolvency. He placed the decision solely upon the want of authority to traffic in stocks, or to purchase them as a means of obtaining money to discharge existing liabilities. The resolution, however, expressly declares that these associations are moneyed corporations, within the meaning of the statutes relating to such corporations, and are bound and affected by those statutes, except so far as they are inconsistent with the provisions of the act to authorize the business of banking, or the act amending the same. (Gillet v. Phillips, 3 Kern.,
114.) In Gillet v. Campbell (1 Denio, 520), an opposite opinion was held. The same judge, however, who delivered it, when he came afterwards to pronounce the judgment in Gillet v.Moody (3 Comst., 479), was not entirely certain that it stood on a firm foundation. *Page 134 
Indeed, I do not see how this conclusion could have been avoided. The fifty-second section of the title concerning moneyed corporations (1 R.S., 599), declares that the provisions of the title "shall be construed to apply to every moneyed corporation created, or whose charter shall be renewed or extended after that time, unless such corporation shall be expressly exempted from this title in the act creating, renewing or extending such corporation." The act of the 18th of April, 1838, must be deemed to have been passed in view of this provision, and the moment the banking institutions formed under it were found to possess the powers and attributes of corporations, and were, in fact, corporations, the result was inevitable that they were subject to the regulations made to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors and stockholders.
The first subject which I shall consider in the progress of this investigation is, the force and validity of the trust deed, and the assignments of the bonds and mortgages, which are parts of the same transaction. It is, under these deeds, that the trustees and the Palmers, and other creditors through them, claim the bonds and mortgages which are the subjects in controversy in both actions. The counsel for the receiver insist that they are void, because not authorized by a previous resolution of the board of directors of the bank. Section eight, of the act concerning moneyed corporations, declares "that no conveyance, assignment or transfer, not authorized by a previous resolution of the board of directors, shall be made by any such corporation, of any of its real estate, or of any of its effects, exceeding the value of $1000." [The learned judge here states the facts substantially, as on p. 22-23, ante, and proceeds.] The resolution of the 6th of January authorized the issue of the bonds to the amount of one million of dollars. It appointed the time from which they were to draw interest. It also authorized the assignment of the bonds and mortgages to trustees to secure the *Page 135 
payment of the money mentioned in the bonds, and did not define the amount of the security, otherwise than by the direction to make it as nearly equal to the sum proposed to be borrowed as practicable, thus leaving it in the discretion of the officers of the bank. The trust deed of the date of the first of February was unlike that of the date of the first of January, in these particulars only: in its date, in the time from which the bonds were to draw interest, and in the names of two of the trustees. One new provision was introduced into the deed of the first of February: the names of John Horsley Palmer, Thomas Dent and James Mackillop, residents of London, and members of the Palmers firm, were inserted as trustees to receive for the bondholders the proceeds of the bonds and mortgages, upon default being made in the payment of the bonds. In respect to the choses in action, assigned as security, the amount by the last arrangement was increased by the additional sum of $200,000, power to determine the amount being given to the officers of the bank by the terms of the resolution. The sole point of inquiry is whether the resolution authorized the transfer of the bonds and mortgages for the uses indicated in the deed. Whether the action of the officers of the bank, in giving effect to the resolution, conformed to its strict letter in other respects is a matter of no moment. The prohibition of the eighth section of the statute is against the transfer of the property without a previous resolution. As to the manner and the objects to be attained by the transfer, or the persons who were to take the property, these are matters in which the section takes no concern. If the resolution was authority for the disposition afterwards made, of the mortgages, then no act has been done which is forbidden by the eighth section of the act, and the trustees and the cestuisque trust may hold them, provided their title be good in other respects. I see nothing unreasonable or unusual in the addition, which the officers of the bank found it convenient to make, to the bonds and mortgages transferred at the time *Page 136 
of the execution of the first deed. The amount to be covered was $1,000,000. The loan was to be obtained in a foreign country, from strangers. Without taking into account the difference of exchange, the property transferred as security was more greatly in excess of the money to be borrowed than is usual in such transactions. The directors saw this, and provided for it, declaring in their resolution that the amount of the property transferred as security should be as near the sum proposed to be borrowed as might be practicable. It is not safe to say that the resolution did not authorize the transfer of the property. The most that can be said is, that it was not transferred to the three trustees named in the resolution. Two of them were changed, and there was no previous resolution to authorize the change. The name of John L. Graham is found in all the deeds. He was an officer of the bank, enjoying the confidence of its directors and stockholders. Without stopping to inquire whether it was in the power of the board of directors to supply the entire want of the previous resolution, demanded by the eighth section, by subsequent ratification, as a natural person in like circumstances might have done, I am well pursuaded that, after the resolution authorizing the transfer of the property had been adopted, the mere change in the name of two of the three trustees, who were to take and hold the property, might become the subject of subsequent ratification and confirmation by the directors, so as to make the transfer operative and valid in law.
The final million trust deed, dated February 1st, 1840, was executed by the parties of the first and second parts in the city of New-York, on the twentieth of April of that year, and forwarded to the Palmers in London for execution at the same time. Before the third of June following, its execution by all the parties was complete. The bonds were also changed so as to refer to Blatchford, Graham and Curtis as trustees, in place of Beers, Graham and Tylee. The alterations to which I have referred, in the several instruments, *Page 137 
were effected in pursuance of resolutions of the committee of investments and finance, who were charged with that part of the company's business. Numbers of these bonds were negotiated and the money advanced upon them, which was received by the company and appropriated to the uses of its business, while others of them were pledged by direction of the company, as security for the payment of moneys advanced to meet the company's bills and pay its certificates of deposit. At this time the Palmers in London held state stocks to the amount of £ 100,000 sterling or thereabouts, the property of the company, as security for money advanced and liabilities incurred for its benefit. Some of the bonds issued under the trust deed were left with them as a substituted security for the state stocks which were then sold for the company's benefit. All these transactions were made upon the faith and security of the trust deed and the assignment of the bonds and mortgages. Three resolutions were also adopted by the board of directors, and entered upon their minutes after the execution of the various instruments: one on the 14th of June, one on the 30th July, and one on the 5th August, 1840, in which Blatchford, Graham and Curtis are recognized as the trustees in the deed. Can the corporation take to its own use the moneys realized from third parties, upon the faith of its validity, and then repudiate the authority by which it was created? If the act done was within the power of the corporation, it must fall within the law of ratification and confirmation, so universally applied to the conduct of those who maintain towards each other the relation of principal and agent. This law should apply with quite as much force to corporate bodies as to natural beings, because, in respect to the latter, the principal may and often does act without the intervention of an agent, and in case of doubt recourse may be had to the principal himself. Not so with an artificial being. It can only act by and through its officers. In one sense they are the agents, in another sense they are the corporation itself. In respect *Page 138 
to persons and things outside of its own organization, to all the world, beside its own members and stockholders, the acts of the officers are the acts of the corporate body. It cannot be represented by its stockholders. No vote, resolution or action of theirs is of any avail in its commerce on intercourse with other persons. It is a fundamental condition of its existence that it can only act by its officers and directors; the stockholders in their collective capacity can do no corporate act. So that, unless we are prepared to say that the acts of the officers and managers of a body corporate, fairly within the scope of the corporate power, not forbidden by any statute, and which contravene no rule of public policy, but which are simply in excess of their authority, are incapable of ratification and confirmation, then the changes effected in the trust deed must be deemed to have been approved and confirmed in the fullest manner. (Story on Agency, 2 ed., § 239, 244; Davis v. Shields, 24Wend., 322; Lawrence v. Taylor, 5 Hill, 107; McCullough
v. Moss, 5 Denio, 567; Farmers' Loan Trust Co. v.Walworth, 1 Comst., 433.) The eight section demands a previous resolution to effect a transfer of the property. The exception, however, which immediately follows, saving transfers in the hands of a purchaser for a valuable consideration and without notice, shows that it was not intended to make the transfer, unsupported by a resolution, absolutely void. The holder, whether he takes directly from the officers of the corporation or from a third person, may always show, in support of his title, that he purchased for value and without notice. And unless it can be established that these bodies are hedged in by some special immunity, and are not subject to the laws of justice and equity which apply to natural persons, he may also show that the corporation, with a knowledge of the circumstances, acquiesced in the sale, and took to its own use the purchase money, or did any other act equivalent to a recognition and ratification of what its officers had done. If I am right in my conclusion, that there has been a *Page 139 
substantial compliance with the requisition which demands a previous resolution, it is not worth while to inquire whether the bondholders are purchasers within the meaning of the exception.
The ninth section of the same title, concerning moneyed corporations, avoids every "conveyance, assignment, transfer, payment made, judgment suffered, lien created or security given by any such corporation, when insolvent or in contemplation of insolvency, with intent to give a preference to any particular creditor over other creditors." The insolvency, or the contemplation of insolvency, with the intent to give the preference, at the time the trust deed was executed and the bonds and mortgages assigned, are facts relied upon by the receiver, to defeat the title of the trustees and those claiming through them. These facts must be established by the proof. The onus rests upon him. The bank must be shown to have been insolvent, or to have contemplated insolvency, on the 20th of April, 1840, that being the time when the transaction must be deemed to have been consummated. There must also have existed, at the time, an intent to give a preference, and this, too, whether the bank was actually insolvent or merely contemplated insolvency. Generally, the qualifying words relate to the immediate antecedent, unless the sense requires a more extended application. Here, the object of the statute manifestly is to prevent preferences while insolvent or with a view to insolvency, and the qualifying words must apply to each of the predicates. Otherwise, an act done for an honest and laudable purpose, even a payment made in the ordinary course of business, with no suspicion of the inability of the corporation to meet all its engagements, could be vacated and avoided by the subsequent discovery of insolvency. If the term insolvency, as applied to this and like institutions, signifies the want of cash or available cash resources with which the bank could have paid its debts and liabilities, outstanding at the time, then it was not solvent. It is not pretended, indeed it could not *Page 140 
be said with any degree of truth, that it had anything of the kind. Its capital consisted, almost exclusively, of bonds and mortgages upon real estate, a kind of property, valuable, it is true, but inconvertible, and incapable of being applied to the payment of liabilities at the counter of a bank. If this want of cash, or resources immediately convertible into cash, constitutes insolvency within the meaning of the act, then most of the banking institutions formed under the act of 1838, were insolvent at the time referred to; for it is notorious that they were without the present ability to meet their liabilities, if suddenly and unexpectedly called upon for payment. I assume, for the purposes of this argument, what the proceedings in these actions, on both sides, affirm, that to acquire the bonds and mortgages, in exchange for its capital stock, was a legitimate exercise of corporate power. Indeed, the act of 1838 seems to have contemplated that the stock of these banks might consist of bonds and mortgages, state stocks or some equivalent not more convertible; for section thirty-three declares that no association shall at any time, for the space of twenty days, have on hand at its place of business less than twelve and a half per cent in specie on the amount of its notes in circulation as money. This provision implies that the rest of the capital might be represented by something else beside specie, without exposing the bank to the disabilities of insolvency. It might be invested in bills discounted, in balances due from other institutions, in stocks of the different states, or in bonds and mortgages acquired for the uses contemplated by the act. The term insolvency can mean nothing less than the inability of the company and the inadequacy of its property to pay its debts, and not a present inability to pay in cash or its equivalent. This construction results from the language, as well as the object, of the section under consideration. That object is to prevent undue preferences, and insure equality amongst all the creditors. If the property is sufficient to pay all, the payment to one does not prejudice the others. The assets may be *Page 141 
presently unavailable, because presently inconvertible. That is not insolvency which furnishes sufficient means for the ultimate liquidation of all the debts. An undue preference amongst creditors means the giving to some that which the debtor withholds from and has not the ability to give to others. Surely upon a bill filed to set aside a payment made or security given, and for an equal distribution upon the ground of insolvency and undue preference, it is incumbent upon the plaintiff to show that the property undisposed of and within the reach of the unpaid creditors is insufficient to satisfy their debts. Anything short of that does not establish the insolvency referred to in the act. The primary and ordinary sense of the term insolvency is, "the inadequacy of a man's funds to the payment of his debts." (Bell's Com., 162.) The meaning of the word as used in the English bankrupt laws has been the subject of some difference of opinion among the highest judicial authorities. Some hold it to mean the inadequacy of the bankrupt's entire property to pay the demands to which he is subject, while others insist that he is insolvent "when his means of present payment are so crippled and his embarrassment is so great that he cannot proceed with and carry on his business in the usual course of trade." (De Tastet
v. Le Tavernier, 1 Keen, 161; Herrick v. Borst, 4 Hill,
650; and authorities cited.) Such a condition as would be deemed insolvency under the bankrupt laws, or which would justify the issuing of an injunction against a banking incorporation upon the grounds of insolvency, falls short of the actual insolvency requisite to avoid a security or a payment made with a view to a fraudulent preference. In the latter case the actual insolvency, the intent to give the preference, and the preference actually obtained to the prejudice of unpreferred creditors, would be indispensable preliminaries to the setting aside the security or the payment and a distribution amongst all the creditors. To this effect is the opinion in Gillette v. Philips (supra), wherein it is said that "when a moneyed *Page 142 
corporation is insolvent in such a sense that all its debts can not be discharged from its assets, the payment of one creditor in full is a preference within the meaning of the statute."
To avoid the payment or transfer upon the other ground mentioned in the section, there must have been a design to give a preference and a contemplation of insolvency. Contemplation is an operation of the mind, a purpose, an intention. The object of the law is to insure an equal distribution of the assets of an insolvent corporation amongst the creditors. The intention to give a preference and become insolvent defeats this end. They are voluntary acts. Payments made under the pressure of importunity, or transfers made with a view to raise money in the hope of a successful prosecution of the business, could not be regarded as manifestations of the unlawful intent. Indeed I do not perceive how a sale or mortgage of property to obtain money, while it is actually appropriated to the uses of the company in the prosecution of its legitimate business, could be esteemed evidence of a design to give a preference. If the object of the law is to insure equality amongst the creditors, the preference must be given to a creditor, and the payment or transfer made to satisfy or secure a preëxisting debt. [The learned judge here cited from Fidgeon v. Sharpe, Crosby v. Crouch andEverett v. Stone, passages defining the intent to give a preference in contemplation of bankruptcy, quoted for the same purpose by COMSTOCK, J., ante, p. 109. He then discussed, at some length, the evidence in relation to the insolvency of the company, and the knowledge of its officers upon that subject, and then proceeded.] It is not easy to resist the conclusion that the weight of the evidence is in favor of the solvency of the company at the time the trust deed and the transfers were made. In 1841, Strong, Davis and others of the directors, purchased no inconsiderable amount of the company's stock. Loans of money were made to it by other directors, and some of them guaranteed the payment of loans of money obtained from strangers. *Page 143 
These proofs, although of no great weight in themselves to establish the ability of the company to meet its liabilities and pay its debts, go far to show the good faith of the report of the 23rd of December, and to repel the idea that the directors contemplated insolvency. Indeed, the correspondence with James B. Murray, the company's agent in London, and other contemporaneous acts of its officers and directors in New-York, exhibit the most entire absence of a design to become insolvent, or to give an undue or fraudulent preference. The object of the trust deed was not to pay or to secure the payment of a precedent debt. Those who were to become holders of the bonds and cestuis que trust,
under the deed, were not creditors of the company until they had parted with their money. And when the proof shows that the object of the transaction was to borrow money for the uses of the company, to which uses it was applied as soon as received, does it not effectually repel the idea of insolvency and a design to give a fraudulent preference? A decision which would defeat and destroy the lien of the bondholders upon this ground, under the circumstances presented by the proofs, would be at variance with reason and good sense. It cannot have my sanction.
It is not claimed that the proof makes out an actual fraudulent purpose in the execution of the deed, but it is said that it is fraudulent, per se, being made in trust for the use of the grantor. The object of the deed was to obtain money upon the bonds. It took the form of a trust, but was, in fact, a mortgage, and, like any other mortgage, made to secure the payment of money to be borrowed. Until the money was obtained it did not have effect. Until that time the transaction was inchoate and incomplete, and subject to the revocation of the company, and consequently to all the claims of the company's creditors. The conveyance and transfer, as soon as it took effect, was not wholly for the use of the company. That was not its principal or primary end. The primary trust in the deed was to secure the payment *Page 144 
of the bonds which should be negotiated; and the securities transferred, and the moneys to be realized from them, were to be held in trust until such bonds of the company, as should be negotiated, were paid. After that, there was the further trust to return the securities pledged or the proceeds of them to the company, or make such disposition of them as the company should direct. Without this resulting trust, either express or implied, for the use of the mortgagor or pledgor, it is difficult to perceive how property, real or personal, can be mortgaged or pledged to secure the payment of a debt. The trust to restore the thing mortgaged or pledged to the mortgagor or pledgor, when the condition is fulfilled is the distinguishing feature between an absolute and a conditional sale. Without the resulting trust for the use of the grantor, the whole title would vest in the grantee or assigned and the sale would be absolute. A trust for the use of the assignor, in a deed of assignment for the payment of debts does not, per se, vitiate the instrument. In itself, such a trust may be wholly inoffensive; but if, in addition to a benefit to the grantor, it may operate to the prejudice or injury of the creditors, then it taints the whole instrument and renders it void. The principle is well expressed by Chief Justice SAVAGE, inWintringham v. La Foy (7 Cow., 735): "But it is contended," he says, "that the provisions for reassignment or repayment of the surplus of the proceeds, after payment of all the debts, renders the assignment void. This is a mistake. In the case ofMackie v. Cairns (5 Cow., 547), the assignment was held fraudulent and void, because it contained a provison in favor of the insolvent debtor, to the exclusion and prejudice of the creditor. Not so here; the debtor is to derive no benefit from the property assigned, till his debts are paid. This provision is precisely what he would have been entitled to if nothing had been said about it in the assignment." Grover v. Wakeman (11Wend., 189), was an assignment upon trust for the payment of debts, coupled with an attempt, apparent upon the face of the *Page 145 
deed, to extort a release as a condition of a preference. The Chancellor and the Court of Errors held the deed void, because it contained a trust for the benefit of the assignor, and to the prejudice of the creditors. Judge SUTHERLAND, speaking of the debtor's right to assign and give preferences, says: "He may assign the whole of his property for the benefit of a single creditor, in exclusion of all others, or he may distribute it in unequal proportions either amongst a part or the whole of his creditors. No matter how or upon what principle the distribution is made, if the debtor devotes the whole of his property to the payment of just debts, neither law nor equity inquires whether the objects of his preference are more or less meritorious than those for whom he has made no provision. Whenever they (assignments to pay debts) depart from the simplicity of a direct and unequivocal devotion of the property of the assignor to the payment of his debts, and contain reservations and conditions intended for ease and advantage, they are viewed with considerable, and I may add, in view of the course of judicial decisions in the state, with increasing distrust." Senator TRACY, in the same case, also says: "Upon every moral principle the property of an insolvent belongs to his creditors; and, although the law tolerates him in distributing it amongst them, according to his notions of right, yet it will not tolerate him in locking it up, in order that in its final distribution he may secure a future benefit to himself. In short, while the law permits a debtor to prefer one creditor to another, it will not permit him to prefer himself to any creditor." So, in Goodrich v. Downs
(6 Hill, 438), Justice BRONSON, speaking of the debtor, says: "He may prefer one creditor, or one set of creditors, to another; but if he secures anything to himself before all the debts are paid, or attempts to extort anything from the creditors as a condition to their receiving the property, the transaction cannot be supported. Leitch v. Hollister (4 Comst., 211), asserts the same principle. "If a part of the fund," says Judge GARDINER, "is assigned for the benefit of preferred *Page 146 
creditors, and a trust as to the surplus, after their payment, is created for the use of the assignor, it is obvious that the creditors who are excluded, some or all of them, must be delayed and injured. As the whole fund would be insufficient for the payment of all the claims upon it, the dividend of those excluded from the assignment must be diminished by just the amount of the surplus secured to the debtor. In the meantime, the whole interest in the property from which it is to be raised, vests in the trustees, and is withdrawn from the reach of process, and the creditors thereby delayed until the winding up of the trust. Cases of this kind, it seems to me, are within the spirit, as they certainly are within the letter of the statute, which declares all conveyances, transfers or assignments of goods or things in action, made in trust for the use of the person making the same, shall be void against creditors existing and subsequent." He adds, that neither the principle to which he adverts, nor the statute, applies to assignments, made in good faith, of a part of the debtor's property, to creditors themselves, to secure their debts. I quote this part of the opinion to show that the trust is condemned, not because it is for the use of the person making it, and so within the personal statute of uses, as it was termed upon the argument, but because, in addition, it excludes some of the creditors from the benefit of the fund, and thereby hinders and delays them, and makes out the fraudulent intent. I omit to notice numerous other cases upon the briefs of the learned counsel, in confirmation of the same doctrine. How, indeed, can any other obtain? Every mortgage of personal estate contains a trust for the use of the mortgagor, a trust to pay over the surplus after the mortgage debt is satisfied. And every deed, transferring personal estate upon trust, for the payment of debts, contains a similar trust for the use of the grantor, express or implied. After the payment of all the debts, the surplus, if there is any, results, by operation of law, or more usually by express provision, to the use of the grantor. So that these instruments, with such a *Page 147 
trust upon their face, are not obnoxious to the statute and vicious unless it also appears that the trust will operate to the prejudice and injury of the creditors. This view is in conflict with that expressed by Mr. Justice BRONSON, in Goodrich v.Downs (supra). He held that the trust in that case for the use of the assignor was within the first section of the personal statute of uses. (2 R.S., 135.) He certainly was quite right in his condemnation of the deed, for it assigned certain wood, and nearly all the other property of the debtor in trust, to convert the same into money, and apply the proceeds to pay four of his creditors, the surplus to be paid over to the assignor. There was no provision for the other creditors, and the deed was assailed by one having a judgment at the time it was made. There was not the slightest necessity for invoking the aid of the personal statute of uses to overthrow the deed, for the intent to hinder, delay and defraud was manifest. The learned counsel, Mr. O'Conor, showed, I think, upon the argument, that in all the cases which have come up in our courts, and they are very numerous, to say nothing of those in the courts of other states, until that ofGoodrich v. Downs, whenever similar deeds have been declared void, because of the presence of a trust for the use of a maker, it was upon the ground that such a trust was proof of fraudulent intent, and not because it was within the first section of the personal statute of uses. The aid of the latter statute, it is believed, has never, until Goodrich v. Downs, been called in for such a purpose. This branch of the law has been repeatedly and thoroughly examined, and greatly illustrated since the case of Sturtevant v. Ballard (9 John. R., 337), decided in 1812. The best minds within the bar and upon the bench have shed upon it the light of their learning and wisdom. But if the doctrine announced in Goodrich v. Downs is sound, and contains the true rule, then their labors were misapplied and their faculties misdirected, for the presence of the usual trust, in the surplus, to the use of the maker, was enough to avoid the deeds without regard to *Page 148 
the intent or the object or the tendency to hinder and delay. The words of the act (2 R.S., 135, § 1), to which the learned judge refers, are as follows: "All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors, existing or subsequent, of such person." There is not one word about intent, or object or purpose, or excluding, delaying or injuring creditors. The effect of the trust is not a subject for consideration. Its mere existence avoids the transfer and destroys the title as against creditors existing or subsequent. The argument leads to this conclusion: although the deed devotes all the property of the debtor to the payment of debts, although it imposes no conditions, and makes no reservations for the benefit of the grantor, the moment a general creditor can point with certainty to the trust in the surplus for the use of the maker, then the statute has effect and the transfer falls to the ground. In Mackie v. Cairns (Hopk., 373), Chancellor SANFORD'S opinion contemplates a different construction, and exhibits the true nature of the trusts condemned by the first section: "A conveyance by the owner of property to another, in trust for himself, is in effect a conveyance to himself, and such a measure can never be necessary for any legal or honest purpose. He who having the full title desires to retain the control and use of his property, and yet transfer it to another, to be held for the use of the grantor, can, in the general course of human actions, have but one motive for that measure, and that motive must be to defeat or elude the claims of others. Hence, all conveyances to the use of the grantor, are fraudulent and null against creditors and others having just claims upon the grantor, or upon the property conveyed. In all the refinements of uses and trusts, in the midst of multiplied distinctions between legal and equitable interests, which have abounded in the progress of English jurisprudence, this principle has never been *Page 149 
doubted, and the mockery of a transfer by a debtor of his property, to be held for the use of the debtor, has never been allowed to defeat the rights or remedies of creditors." These observations exhibit the true rule of construction, and show that the trusts referred to in the section are those mere passive trusts, exclusively for the use of the grantor, and where the title of the trustee is purely nominal, and the grantor is to retain the control and enjoyment of the property, and not trusts which are incidental, expressed or resulting to the use of the grantor, after the execution of primary trusts, active, commendable and lawful. A transfer of property upon trusts, to secure the payment of a precedent debt, or of money borrowed, or upon the trust to sell and convert into money, and apply the proceeds to the payment of debts, with the usual trust in the surplus to the use of the maker of the deed, is not a trust for the use of the grantor or maker, within the meaning of the first section of the personal statute of uses; because its primary purpose is not to the use of the maker. It is an active trust, devoting the property to other uses, to wit, the payment of debts or of the borrowed money, and whatever trust there is for the benefit of the maker is purely incidental to the principal object. This court, in Leitch v. Hollister (supra), has in effect so held. Judge GARDINER, after referring to the provisions of the section under consideration, proceeds to say: "Neither the principle to which I have adverted, nor the statute, applies to mortgages made in good faith of a part of a debtor's property, to creditors themselves, for the purpose of securing particular demands. The conveyance, whatever may be its form, is, in effect, a mortgage of the property transferred. A trust as to the surplus, results from the nature of the security, and is not the object or one of the objects of the assignment. The assignee does not acquire the entire legal or equitable interest in the property conveyed subject to the trust, but a specific lien upon it. The residuary interest of the assignor may, according to its *Page 150 
nature, be reached by execution or bill in equity. The creditor attaches that interest as the property of the debtor, and is not obliged to postpone action until the determination of the trust. He is, therefore, neither delayed, injured or defrauded in any respect." And is not the residuary interest of the assignor — that is, his interest in the trust for his use — in the case of an assignment of property to pay debts, equally within the reach of a creditor and equally applicable to the payment of debts? And is the delay attended upon closing up the trust likely to be greater than in ascertaining and appropriating the surplus resulting from the mortgage? I respectfully submit, however, that the bona fides of the mortgage, the nature of the title which the grantee takes, and the speed or delay in closing the trust, have little to do with the question. The inquiry purely and simply is, whether this class of trusts for the use of the grantor, which are not the object of the deed, but are necessarily incidental thereto, are within the first section of the act which forbids trusts for the use of the person making the same. Leitch v. Hollister was the case of a mortgage of a chose in action to secure a debt, reserving the surplus to the mortgagor. Its validity was put in controversy by a judgment creditor, upon the ground that it reserved a trust for the use of the maker. The court sustained the instrument upon the reasoning which I have endeavored to give. I cannot regard it otherwise, when taken in connection with the course of judicial decisions upon kindred subjects, than an authority in support of the trust for the use of the banking company in the deed of the 1st February, 1840.
Among the objections taken by the receiver to the bonds which it is the office of the trust deed to secure, is that of usury. At the sum at which they were taken by the holders, a rate of interest greater than that provided by the laws of this state or of England was reserved. They were actually sold in London, were made payable there in pounds sterling, the currency of Great Britain. The contracts must be deemed *Page 151 
to have been made there, as they certainly were to be executed there. They are, therefore, to be governed by the laws of that kingdom. To invalidate the bonds under the usury laws of Great Britain, it will be necessary, first, to establish that they are not specialties; that, being unsealed, they are promissory notes, within the case of Leavitt v. Palmer. This is one of the disputed points in the case. The act of 2d and 3d Victoria,ch. 37, set out in the cross bill, and which was in force when these contracts were made, repealed the usury laws as to all bills and promissory notes not having more than twelve months to run, and also as to all other contracts for the loan or forbearance of more than £ 10, with a proviso that the act shall not extend to loans of money upon the security of lands, or of any estate therein. Without examining whether security upon lands in the United States brings the loan within the proviso, or whether the bonds were the principal subject of the contract, and the transfer of the mortgages only collateral thereto, and so within the principle of the English cases cited upon the argument, I think the receiver has been deprived, by a statute of our own, passed during the pendency of these actions, of the power to make any such defence. Our act to prevent usury, passed May 15th, 1837, is severely penal in its provisions. It is, in fact, a barbarous act, unworthy of the age and country where it is found, for it abrogated the just and equitable maxim, that a plaintiff, to entitle himself to equity, must do equity, and required the chancery courts to lend their aid to enforce a penalty or forfeiture. In section one, the usurious contract is declared void, whatever may be its form; and in section five it provides that whenever it shall appear, by the admissions or the proof, that any bond, bill, note, assurance, pledge, conveyance, contract, security, or any evidence of debt, has been taken in violation of the act, the court of chancery shall declare them void, and order them to be surrendered and canceled. Section six makes the taking of usury a misdemeanor, punishable by fine and *Page 152 
imprisonment. These features are brought out to show the penal and savage nature of the act, and for the purpose of giving point to the repealing statute of April 6th, 1850. It is entitled, "An act to prohibit corporations from interposing the defence of usury." "No corporation," says the first section, "shall hereafter interpose the defence of usury in any action." Section two declares, the term corporation shall be construed to include all associations and joint-stock companies having any of the powers and privileges of corporations. The receiver, in these actions, represents the company, and, in respect to the claims of the bondholders, can only make such defence as the company could make. This latter statute does not create a debt, as is said by the receiver's counsel, for that proposition assumes there is no debt, and that is the point in dispute. Prima facie, at least, there is a debt, for there is the written obligation of the bank acknowledging the existence of a debt, as there certainly is, also, a moral obligation to pay. Nor does the construction which makes the law retrospective, render it void. That depends upon its effect, whether it impairs obligations or takes away vested rights. Every right resting in perfect obligation is vested, and cannot be disturbed; but rights, arising under a statute, which are imperfect and inchoate, cannot claim any such immunity. For example, the right given to redeem under the statute of executions, was held to be taken away by a repealing act passed subsequent to the time when the right to redeem accrued. (ThePeople v. Livingston, 6 Wend., 526; The People v.Townsey, 5 Denio, 70.) The general rule of the common law is, that a statute shall be so construed as not to have a retrospective operation. (1 Bl. Com., 45; Bac. Abr., StatuteC; Sackett v. Andross, 5 Hill, 327; Palmer v. Conly, 4Denio, 374.) In Butler v. Palmer (1 Hill, 324), where most of the authorities are referred to, Mr. Justice COWEN says: "A number of cases have been cited by the counsel for the defendant, and some very strong ones, to show that any enactment of the *Page 153 
legislature, annulling contracts or creating new exceptions and defences, shall be so construed as not to affect rights of action existing at the time of the enactment. Cases were also cited to show that a statute in any way modifying the remedy of a party by action, shall never be so construed as to affect actions before the statute. But these are all cases relating to positive enactments; none of them arose upon a repealing clause." "The amount of the whole comes to this, that a repealing statute is such an express enactment as necessarily divests all inchoate rights which have arisen under the statute, which it destroys. These rights are but incident to the statute, and fall with it unless saved by express words in the repealing clause." Butler
v. Palmer involved the right of a judgment creditor to redeem, which was held to have been taken away by the operation of a subsequent statute. This case, and those there cited, are also authority for the rule that the effect of a repealing clause, upon a previous statute which imposes a penalty, takes away all right to the penalty. If the repeal takes place after conviction, it arrests the judgment. Chief Justice SAVAGE, in delivering the opinion in The People v. Livingston, indicates the rule in the following words: "For instance, the present statute prohibits gaming, and allows an action to be brought to recover back money won at play. An action is brought and ready for trial; the day before the circuit the legislature repeals the act; the suit dies because the court has no jurisdiction, and the party has no right to recover the money. Such right did exist, subject to the contingency of obtaining a judgment, and such jurisdiction too, existed, but both have been taken away because the means of enforcing the right no longer exists." The borrower can have no vested interest in the penalty or forfeiture which follows the proof of usury in an action where that defence is interposed. Whatever right he had was contingent upon the fact of the usury being established upon the trial. This the repealing act declares shall not be done. It makes *Page 154 
no difference whether the forfeiture is given to the borrower, to be recovered in an action, as under the gaming statutes, or whether it is given him by way of defence to an action brought to enforce the contract. The form of the remedy is of no moment. In either case it is the penalty which the law imposes upon the lender, which the borrower seeks to appropriate to his own use; and the act under which he hopes to effect this must be subject to the same rules of construction as other penal statutes. The effect of the act of the 6th April, 1850, is to repeal the statute of usury so far as it applies to corporations. The condition of this class of beings becomes the same as if the usury laws never existed. The title of the repealing act is significant. It is "to prohibit corporations from interposing the defence of usury in any action." The first section then declares, in a few short emphatic words, that the defence of usury shall not thereafter be interposed. It is the defence which is prohibited, The barrier wall, the place of strength which the usury laws set up between the lender and the borrower, is thrown down and leveled with the ground, whenever the borrower is a corporation. Henceforth the law offers no rewards for bad faith and broken promises to this class of contractors. The act is not limited to contracts thereafter to be made, or actions thereafter to be brought; but it declares, without qualification, limitation or exception, that the defence shall not be interposed. Nor is the word interposed to be restricted to the time of serving the plea or answer. This would be a narrow interpretation. A defence is certainly interposed when set up in the answer, and in like manner it is also interposed when resorted to upon the trial, but the interposition is not complete until it is heard and disposed of at the trial. The object of the act is to take away from corporate bodies the defence of usury — a defence which most men have come to regard as immoral, mischievous and unjust. It should have a liberal interpretation. *Page 155 
In the several cases reported in the books, where the powers, rights and obligations of the banking associations have been the subjects of judicial decision, it is nowhere determined that they are within the prohibition contained in the thirty-fifth section of the safety fund act. (Laws of 1829, p. 173.) In Leavitt
v. Palmer, the instruments did not profess to be anything else than promissory notes, payable on time, with interest, and they were held void under the fourth section of the act of the 14th of May, 1840, having been issued after it took effect. In Talmage
v. Pell (3 Seld., 328), the paper was in the form of certificates of deposit, negotiable, payable on time, given to the State of Ohio upon a purchase of stock to be resold. They were held to be promissory notes, illegal and void, because the bank had no authority to traffic in stocks. Judge GARDINER, who delivered the only opinion, declined to consider whether they were void under the thirty-fifth section of the safety fund act. The certificates of deposit in the New-York Life Insurance andTrust Co. v. Beebe, were held to be illegal, because they were issued to be loaned in contravention of section four of the restraining act. (1 R.S., 600.) Judge SELDEN, in delivering the judgment upon the claim of The State of Indiana v. The NorthAmerican Trust and Banking Co. (4 Kern., 178), assumes that associations under the banking law, even prior to 1840, had no power to issue negotiable paper on time; placing this assumption, however, not upon the safety fund act of 1829, but upon the general principles of law, which limit corporations to the exercise of the powers expressly given to them, or such as are necessarily incident thereto. Judge MITCHELL, in the same case, asserts, upon grounds which I think it impossible to controvert, that the safety fund act is not a general statute within the meaning of the resolutions of the court adopted in Talmage v.Pell, and that the moneyed corporations, subject to the provisions of the act, are those only which contributed to the fund, and which existed, or should exist, *Page 156 
under the banking system which prevailed before the law of 1838 took effect. The bonds in the present actions were made and sent abroad, to be negotiated before the act of the 14th of May, 1840; and although some of them may have been finally negotiated by the company's agent in London after that time, still, as the transfer took place in a foreign country, and they were taken in good faith and for value, in no aspect could the transaction be deemed within the prohibition of the fourth section. The prohibited securities are notes and bills payable on time, with interest. I shall presently attempt to show that these instruments were neither the one nor the other. They were not issued to be loaned, nor were they designed to circulate as money. They were payable abroad in sterling money, a currency unknown to the laws of this country. They had neither the form nor the substance of circulating notes, and were not convertible except into the stock of the association. In no sense, therefore, can they be regarded as issued in violation of the sixth section of the restraining act. I refer to these statutes for the purpose of showing that up to May, 1840, there was no legislative expression against the issuing, by the banking associations formed under the law of 1838, of obligations for the payment of money on time or with interest, and not intended to be loaned or to circulate as money, although such obligations should assume the form of promissory notes. Whether such an act was ultra vires is another question.
This brings me to consider what I have regarded as the principal question to be determined, and that is, the power and authority of these corporations to borrow money. If they have no such authority, then the transaction of obtaining the money and issuing the bonds is ultra vires, and cannot be upheld. But, on the other hand, if the obtaining money upon loan is an act fairly within the scope of the legitimate power of the association, then the contracts are legal and valid, and such as the law will execute and enforce. *Page 157 
It is useless, at this day, to theorize and speculate upon the nature and the limits of corporate powers generally. "The modern doctrine is to consider corporations as having such powers as are specifically granted by the act of incorporation, or as are necessary for the purpose of carrying into effect the powers expressly granted, and as not having any other." (2 Kent'sCom., 290.) The eighteenth section of the act of 1838, specifies most of the powers given to the banking associations, but not all. They shall "have power to carry on the business of banking, by discounting bills, notes and other evidences of debt; by receiving deposits; by buying and selling gold and silver bullion, foreign coin and bills of exchange, in the manner specified in their articles of association, for the purposes authorized by this act; by loaning money on real and personal security, and by exercising such incidental powers as shall be necessary to carry on such business." The last clause is also to be found in the third section of the act in regard to the general powers, privileges and liabilities of corporations. (1 R.S.,
600.) Sections one, two, three and seven, of the act of 1838, confer two additional powers of very great importance; the power to convert their capital, or a portion of it, into state stocks, bonds and mortgages, and to deposit the same with the comptroller, in exchange for circulating notes, and the power to loan and circulate the same as money. Such notes are to be made payable on demand, at the place of business of the association by whom they are issued. The power to borrow money is not given in words or terms. If it exists at all, it is as an implied and not as an express power. The implied powers exist by virtue of the grant, and are not enumerated and defined; because no human sagacity can foresee what implied powers may, in the progress of time, the discovery and perfection of better methods of business, and the ever-varying attitude of human relations, be required to give effect to the express powers. They are, therefore, left to implication. Unless the power claimed, be directly and *Page 158 
immediately appropriated to the execution of the specific powers, and a useful and necessary means to give them effect, it cannot be recognized as within the scope and measure of the grant. Whatever incidental power is a necessary and appropriate method to enable a banking institution to carry on the business of banking in the manner, to the extent, and with the means contemplated by the act of 1838, is as clearly within the terms of the grant as if it had been specifically mentioned. Before we can say, with any assurance, whether the power to borrow money is to be implied, we must look at the act under which the associations are created, and see the nature of the business in which they are to embark, the usual and customary modes in which it is conducted, the instruments and resources with which they are to be furnished, and the emergencies and hazards to which the business is necessarily exposed. Banking is a system of credits. Its circulation is upon credit, it receives deposits upon credit, and if it deals in exchange, either domestic or foreign, that too, is upon credit more or less. It discounts bills and notes upon the faith and credit that its circulation will not be suddenly returned for redemption, or its deposits suddenly withdrawn. It is thus that it multiplies its capital and realizes its profits. Take away its power to use its credit, and confine it to the use of its capital alone, and its business would perish. Thus we see that, under the act of 1838, the circulation is to be based upon state stocks, and bonds and mortgages upon real estate, deposited with the comptroller, and twelve and a-half per cent in cash in the vaults of the banks. Neither the state stocks, nor the securities upon real estate, are convertible into money, except at the end of a long and tedious process. While the liabilities of the banks, the circulating notes and the deposits, are payable on demand, bills discounted are payable on time. With its liabilities constantly due and open to demand, and its resources unavailable for the moment, it is easy to see that, without the power to obtain temporary relief in an *Page 159 
emergency, institutions perfectly solvent would be driven to the wall. I therefore infer that, with such an organization and such a basis, the legislature designed to place the power to borrow, in an emergency, amongst the implied powers granted. It could mean nothing else. It surely intended the business should be safely and successfully prosecuted. It surely did not design to deny to these institutions the means of self-preservation. What other power, express or implied, is there which can be exerted so readily, so effectually, and so beneficially to themselves and their creditors, as the power to obtain relief under a pressure, until their own resources can be called in and made available? Relief might be found, it is true, in a sale of securities and evidences of debt in the market; and this was the argument upon the hearing. If there is any difference in point of expediency and safety, between a sale of the securities or a temporary loan, it is greatly in favor of the latter, for reasons which I need not name. I am unable to see why borrowing, under such circumstances, is to be deemed an act ultra vires. It does no more than create a debt. A debt without limit may be created under the power to receive deposits. And so is a debt created under the power to issue circulating notes. In these forms, the banks obtain the money of their dealers, without objection, and apply it to the uses of their business. Surely, the repayment of deposits and the redemption of the circulating notes, is an object which the law will encourage and aid, and any reasonable authority which may be necessary to effect it, promptly and without delay, will be regarded as amongst the implied powers referred to in the act. What possible rule of public policy is transgressed for such a purpose? What possible difference can it make whether the debt is due to depositors and bill-holders, or to lenders who have parted with their money after a full examination? Banks should be lenders, and not borrowers, of money; and it cannot be denied that a habitual and frequent resort to loans must lead to disaster. This, however, is an abuse of *Page 160 
the power, and no argument against its existence; nor is it any reason why it may not be judiciously and beneficially exercised. The right to raise money by loan for a legitimate end, must exist as one of the incidental powers of the corporation, because its exercise may be indispensable to the preservation of its credit and the successful prosecution of its business. There is a wide difference between the power to issue bills or other evidences of debt for circulation, and the simple power to borrow money. The one is fraught with mischief, while the other is comparatively inoffensive. The one is the sovereign power to issue bills of credit and furnish the circulating medium, while the other furnished no inconsiderable portion of the capital which supplies the channels of business and commercial intercourse. Bankers, merchants, and all others, must resort to it for aid, in periods of inactivity and depression. So long as power is given to employ credit, as the basis of discount and circulation, the power to borrow must be implied, or the business cannot be usefully or successfully conducted. To refuse to recognize it as one of the powers conferred by the statute, is to withhold from the banking institutions a function essential to their existence.
The stock of the banking company was originally $2,000,000, and it was afterwards increased to $3,285,900. More than three-fourths of this large sum was made up of bonds and mortgages upon real estate, of which those in controversy in these actions were a part. The bank might acquire this class of securities upon loans under the eighteenth section. It might also acquire them for the purpose of deposit with the comptroller, under the seventh section. The bonds and mortgages were taken in exchange for the company's stock, and comparatively few of them were lodged with the comptroller. Beyond the two sections to which I have referred, and for the purposes therein indicated, I know of no authority of the bank to accept securities of this character. Yet nobody seems to doubt *Page 161 
its power. The trustees and the bondholders claim them under the trust deed, and the receiver claims them as the representative of the bank and the other creditors, and as its property. Yet it will be no easy task to maintain this right of property, if the title is subjected to the rigor of the rule which the receiver seeks to apply to the claims of the bondholders. All parties seem, nevertheless, to concur in the idea that the bank acquired the bonds and mortgages rightfully, and is to be deemed to have been the true owner at the time they were taken in exchange for the capital stock. To what end was it to hold these securities? They were not immediately convertible into money, and, except such portion of them as might be used to obtain circulating notes from the comptroller, for all the other purposes of banking they were useless. The bank had the right of property, and with it the incidental right of sale, absolute or conditional. If they could be converted into money by an absolute sale, or by becoming the basis and security for a loan, they could be applied to the uses of the bank, but in no other way. If I am right in thinking the bank had the power to borrow money, and that it was the owner of the bonds and mortgages, with the incidental right to sell them, all question upon this branch of the case would seem to be disposed of; because the execution of the trust deed, and the issuing of the bonds, and the subsequent transactions with the foreign creditors, was the simple exercise of these powers, and nothing more. Rather than sell the bonds and mortgages in the market, at a depreciation perhaps, the bank chose to borrow the money and put them in pledge to secure its repayment. If the right to borrow money and to sell the bonds and mortgages existed, as incidental to the powers expressly granted by the act of incorporation, the wisdom with which they were exercised, or the consequences which followed, do not belong to the courts to consider. The trust deed is the instrument by *Page 162 
which the pledge was made, and the bonds delivered to the lenders are the written contracts specifying the sums borrowed, the rate of the interest, and the time and place of payment. Some of the bonds passed directly to those who loaned the money and received them as the evidence of the investment. Others of them were delivered to and pledged with the Palmers, as security for the moneys advanced, and to be advanced, by them to pay the company's bills and certificates of deposit. The right to mortgage or pledge property as security for future advances, which may be made prior to the attaching of a creditor's lien, does not seem to admit of any dispute. (Bank of Utica v. Finch, 3 Barb.Ch. R., 293, and the cases there cited.)
It was a point much relied upon at the hearing, that these instruments were promissory notes payable on time and with interest, within the decisions before referred to, and not bonds or specialties, because there was no such seal upon them as is required by law. They certainly possess some of the qualities of promissory notes. They are written promises for the payment of money absolutely, and at all events. In this respect, bonds for the payment of money and promissory notes are not unlike. They have also the quality of negotiability in some sense, for they are payable to Walter Mead or his assigns, and upon them is written an assignment executed by Mead, under his hand and seal, with a blank, where the name of the assignee may be inserted. This formality of transfer is seldom found in connection with a promissory note. On the other hand, the form of the instruments is that of bonds. This is the designation given to them in the instruments themselves, and also in the trust deed. They have also a formal attestation clause, in which it is said the banking company have caused this bond to be attested in their behalf by their president and cashier, and their seal to be thereunto affixed. Then follows the corporate seal, impressed with a screw press, and standing in plain relief upon the paper. There *Page 163 
is no wafer, wax or other tenacious substance upon which the seal is impressed, and this is the point of the objection. The common law demands an impression upon wax, wafer or some other plastic substance. (4 Kent's Com., 452; Bank of Rochester v. Gray,
2 Hill, 227; Farmers' Mechanics' Bank v. Haight, 3Hill, 493; Coit v. Milliken, 1 Denio, 376.) The act of the 7th April, 1848, which authorizes a corporate seal to be affixed, by an impression directly upon the paper, declares it shall not affect the rights or remedies of parties to suits or proceedings commenced before its passage; so that the ancient rule is in force as to these instruments. I regard it as of no moment by what name they are called. If they are not obligatory upon the corporation as bonds, they are as special contracts for the payment of the money obtained under them; and if the judicial conscience cannot be satisfied with anything less than the common law seal to make them effectual for the purposes intended by all the parties to them, then the court should relieve against the defective execution and reform them, upon the pleadings and proofs in these actions. The banking company intended to give, and the holders intended to receive bonds, under seal executed in due form. The former omitted to affix the seal, and the latter supposed it was duly affixed, and thus made a mistake of fact. The present instruments are not those which either party designed should be executed; and if they are reformed and the proper seals affixed, it will not be substituting one class of instruments for another. The principle is stated by Mr. Justice STORY (1 Eq.Jur., § 115), in commenting upon the case of Hunt v.Rousmaniere (8 Wheat., 174; and 1 Peters, 13), in the following words: "Equity may compel parties to execute their agreements, but it has no authority to make agreements for them, or to substitute one agreement for another. If there had been any mistake in the instrument itself, so that it did not contain what the parties had agreed on, that would have proved a very different case; for where *Page 164 
an instrument is drawn and executed, which professes or is intended to carry into execution an agreement previously entered into, but which, by mistake of the draftsman, either as to the fact or the law, does not fulfill that intention or violates it, equity will correct the mistake, so as to produce a conformity in the instrument." (Champlin v. Layton, 18 Wend., 407; Hall
v. Reed, 2 Barb. Ch. R., 500; Many v. Beckman Iron Co., 9Paige, 188.) The claim that a corporation may take to its own use money or property, under a contract, made at its own solicitation and for its own benefit, and then repudiate its obligation to pay the consideration, not because it is malum inse, or against any general principle of public policy, but simply upon the ground of excess of authority, was very justly and effectually overruled in Tracy v. Talmage (4 Kern.,
162), upon principles and authorities which will command universal assent. The court did not approve of the company's traffic in stocks, nor would it lend its aid to enforce the collection of the certificates issued in payment, but it held the company liable for the value of the property purchased and received under the contract, and thus set its face resolutely and firmly against the system of spoliation which the defence ofultra vires, if successfully applied to such cases, is sure to create and encourage.
In respect to the claim of Holford Co., and the transactions with the Philadelphia banks, I deem it unnecessary to say more than to express my concurrence in the opinion just read by Judge COMSTOCK.